I'd be happy to hear an argument in Raymond James Financial Services v. Cary and Mr. Chapman whenever you're ready. May I please report? Good morning, Your Honors. My name is John Chapman. I have the honor to represent the appellants in this case, Peter Cary, Donya Smith, Robert Barkin and Christine Spoehler. Broker-dealer firms are the first line of defense in protecting investors. The SEC has said, if we cannot rely on firms and their principles to regulate their own employees and to protect the investing public from unscrupulous representatives, an undue burden is shifted on the regulatory authorities to police the industry. Raymond James had an associated person in its Boston-area branch office, Keogh, who sold millions of dollars of illegal securities to the public. He leveraged his illicit activities and multiplied the harm to the investing public by recruiting at least one unlicensed agent to help him procure sales of this illegal security. Appellants are among the... to go after Innofin or Keogh or AFLT in this case. I mean, where are they just... are they judgment-proof or are they somehow getting off scot-free or was there an attempt to bring them into an arbitration or to make them a subject of a civil action or... where are they in all of this? Innofin is in bankruptcy. AFLT, I believe, was the subject of a civil suit and... By your clients? Not by my clients, by others. I believe that it's fair to say that both AFLT and Keogh are... well, that Keogh is judgment-proof, doesn't have resources to pay a judgment if one were rendered against him. Mr. Chapman, is it correct that the investors purchased from Innofin directly? It's not correct, Judge Keenan. The investors purchased through Kevin Keogh. No. I understand that the money was paid to Mrs. Keogh. Mrs. Keogh was compensated, but where did they... from whom did they actually purchase? Where did they make payment for their purchase? The issuer was... Because it's not clear in the record, and the brief's kind of... I think actually hedged a little bit. Where did the check arrive from the investors? Did it go to Innofin? The check went to Innofin through sales agents. Raymond James did not make a market in Innofin. So what actually did Mr. Keogh do? Mr. Keogh received over a million dollars in sales commissions from Innofin, and in fact... Right, but I'm saying what did he do vis-à-vis these investors? AFLT was the person who was recommending the Innofin investment. Was he not to the investors, his tax client? Well, the fair interpretation of those facts, I believe, and the presumption to be drawn is that AFLT was working for Keogh. That's manifest in the commission schedule. Right, but you have to show that you're a customer of Raymond James or an associated person of Raymond James, and I think it would be helpful for this presentation if you would walk us through referencing our opinion that was just released last week in UBS versus how your clients fit that definition of customer. Your Honor, they are customers in that they did business with an associated person. Well, but under our definition at page 14 of the opinion, it says that a customer has to purchase commodities or services from a FINRA member in the course of the member's business activities. Now, the course of Raymond James, even if you assume for purposes of this question that Mr. Keogh is an associated person of Raymond James as a broker, how was this a transaction that involved a purchase from a FINRA member in the course of Raymond James' business activities? This was totally a side business of Keogh's. It wasn't in the course of the member's business activities as we've defined customer in this Carillion case, is it? I think that consistently this Court, in the Owen opinion and myriad other courts, virtually every other jurisdiction, has described a customer as someone who does securities business. Right, but we've defined customer in our Carillion case. I mean, we've changed the landscape for the Fourth Circuit, haven't we, essentially? I mean, the Fourth Circuit never had a definition of customer until last week. I mean, it patched together different relationships in the different jurisdictions. Your Honor, I would argue that Raymond James is in the business of selling securities to the investing public. It is in that business. Right, but the customer has to purchase from the FINRA member products in the course of the FINRA member's business activities, according to our definition in Raymond James. So how do your clients fit that definition of customer? If you could walk us through that, I think you're going to have to do that in order to make your case today. Thank you, Your Honor. Raymond James is in the business of selling investment securities through agents, through licensed representatives, and it authorizes its registered representatives to sell securities and the business that a registered representative conducts pursuant to that authority is the business of the broker-dealer. Right, but see, our definition in customer isn't talking, the glasses are on what the investor is doing. Is it purchasing commodities or services from the FINRA member in the course of the member's business activities? So not what Raymond James is doing, but what is the investor doing? That's what's defining the relationship under our opinion in Grillion Clinic. The touchstone in this analysis, Judge Keenan, is the duty to supervise. And there is a duty to supervise pursuant to 3010 that requires... That's really general because that goes to maybe a relationship between the brokerage house and the individual broker. But what I want to focus in on is customer as it's defined in the context of a brokerage setting. Almost every customer of a brokerage house that I know has an account with the brokerage house. They open an account. The account has a number. Generally it's about six or seven digits. The account number goes on and on. And the customer or the person dealing with the brokerage house gets monthly statements and biannual statements and there's that kind of relationship. But the touchstone of it or maybe not fully that, but it sort of defines the customer relationship. And the problem is they didn't have any accounts. Raymond James never opened an account with them. They never opened an account with Raymond James. Now that may not... All these things tend to be multifactored tests. Judges love to have seven or eight or nine factors in these kind of things, totality of the circumstances, which don't particularly give anybody any guidance sometimes. But isn't the touchstone of the broker-customer relationship whether an account is opened with the brokerage house? No, Your Honor, that's not the case. The real point of reference, I think, is the arbitration agreement. The arbitration agreement exists between FINRA and Raymond James. And the arbitration agreement says that a customer who brings a dispute arising out of the member's business is entitled to arbitrate. Right, but you have to be a customer. But you have to be the customer, which is where the question is. And courts have said, including this court and Allen have said, that customer does not require privity, does not require a transactional relationship, does not require an account relationship. But in your own case, the investors, they were under the impression they were dealing in some way with the firm. And here, these people didn't even think they were dealing with Raymond James. See, the difficulty is you just can't... I mean, I love arbitration as much as the next person. I mean, I think that the Federal Arbitration Act is a wonderful thing and that arbitration has many, many advantages. But the downside of it is you just can't jam someone and force someone into arbitration when they haven't agreed to it. I mean, that becomes just naked coercion independent of any basis in law. I agree with that and I believe that's exactly right. But I believe, Your Honor, you're taking an apparent authority type analysis. You're putting the focus on the customer and what the customer believed and the customer thought. In these Ponzi scheme cases... Wasn't there any evidence in this record that there was apparent authority in this Did I misunderstand you then? I'm sorry. Yes. What were you talking about apparent authority then? I beg your pardon. I was commenting on Judge Wilkinson's comments about the absence of an account relationship and the customer's subjective beliefs as to who they were dealing with. And I said, it's not an apparent authority analysis that we're relying on here. What we're relying on here is essentially it's an arbitration clause and it turns on the intention of the parties. It's a contract analysis. The arbitration clause goes back to the word customer. Right. And the contract is between Raymond James and FINRA. But let me interject and say I think in looking at your action, I had a strong inclination to head in your direction on this until that case came out last week. And you're familiar with it. The USB case. I know. UBS case. You're familiar with the case that Judge... I'm sorry to say that it was not brought to my attention. I'm at a loss. If you want to read that... Yes. It looks to me to be a game changer for you because that case defines customer. And I followed you on your argument, quite frankly. I thought that Washington Square perhaps would lend you some support for the proposition that because in that case, there was no knowledge. There was no even notification to the actual firm that in fact these were going on with an associated person. They were minions there. And the issue here is negligent supervision. We're talking about a forum. And so there's only a question of where will you go. It doesn't mean ultimately you will win. But that case last week defined customer. And when you go back to your seat, if you can find someone to get that case for you, you can help us out a little bit because there's no way we can decide this case, in my view, without consideration of that definition. It has changed the game, in my opinion. But maybe you can help us and go in another direction. Well, I thank you, Judge Wynne. And I would ask Lee to file a supplemental brief with the court's indulgence to address that case that certainly should have been brought to my attention and I did not see it come out. But returning to the point I was making regarding the contract analysis, the parties understand since 2001, courts have required FINRA members to arbitrate disputes with individuals with whom they had no account relationship, with whom they had no dealings, no transactional involvement of any kind, simply on the basis that those individuals were doing business with registered representatives who ought to have been supervised. And it arises out of... The question here is whether they were even doing business with the representative. Because I thought all their dealings were with AFELT. Your Honor, you're correct. There is an issue as to that. And the trial court resolved it by saying there was no agency. I mean, was this set up in some way so that Raymond James and Keogh would have deniability? Or was AFELT a straw man? Or what was going on? I think those are all the questions that one would ask. And I think that every presumption has to be bent in favor of arbitration. The trial court did exactly the opposite. The trial court just simply concluded that AFELT was not Keogh's agent. But in Carillion last week, we explained that the presumption of arbitrability comes when you have established that the parties already have a contract to arbitrate. The presumption of arbitrability isn't read in to establish the existence of the contract. Judge Niemeyer made that really clear. And I think that, arguably on, did not make it as clear. And so he took great pains to clarify that the contract has to stand on its own, on contract principles. And only when you have that contract established do you have the presumption of arbitrability that is the scope of the subjects that the parties have agreed to arbitrate. So that doesn't really help your analysis here. I agree with what you're saying, but courts have found that the agreement entered into by Raymond James voluntarily to become a FINRA member contains an arbitration clause which non-signatories can enforce. That's a U.S. Supreme Court case in AT&T Tech versus Communication Workers of America. So there is a written arbitration agreement that requires Raymond James to arbitrate disputes. It is ambiguous because it says essentially it only excludes from status as customer, brokers, and dealers. But nevertheless, courts have held that that is a binding enforceable by... definition of customer. They weren't applying the Fourth Circuit definition of customer. No, this is simply as to the existence of a written arbitration agreement. I'm going to reserve time for rebuttal and we'll hear you at that point. Mr. Cochran, let's hear your side of it. Your Honors, I think the UBS case certainly clarifies on and is consistent with the definition of customer that's recently been published by FINRA in their Revenue Regulatory Notice 1255. 1255, which the court may have not seen, it just came out a couple of weeks ago, basically says exactly... So why do you... just tell us, working from the UBS case, why, in your view, was it not in the course of Raymond James' activities? Well, I think the stipulation in the affidavits established precisely that. How so? The stipulations, and there were seven, I think there are two that are fairly critical to the court's analysis. The sixth one says the defendants did not understand that they were purchasing anything or any other security from Raymond James. And it goes on to say the defendants did not understand they were purchasing anything from an agent whom they believed to be authorized to act on behalf of Raymond James. And there is, throughout the cases, the analysis has been, is there some nexus, is there some connection between the customer and the member or the customer and an associated person? You have to have that connection. I think in UBS you've defined that connection in a very precise way. It has to be... Weren't there commissions that arose from these transactions that, in fact, the associated person received? Actually, I think the evidence is his wife received it. He set it up because he knew that he couldn't be involved in this as a broker. He set it up so I think his wife received most of the commissions. But if you look at the affidavits... And the inference there is by his wife receiving it, he didn't receive it. Well, I wouldn't be so foolish as to say he didn't, but it was set up that way. He got a percentage of the commissions, as did Mr. Affeld. Was his wife a separate broker? Was she entitled to receive these because she worked for a different firm or something? I think she was a broker who was entitled to receive it, Your Honor.  But the other key thing is in the affidavits from these claimants. Two of them actually met with Mr. Keogh. All four were told by Mr. Affeld, Hey, I refer my broker's business to Mr. Keogh. Two of them met with him and said, I don't want to do business with him. The other two didn't meet with him. Lurking in the background of this case is the whole question of negligence supervision, and that's the way that the claimant here or the investors here want to rope in Raymond James. They said, look, Keogh worked for you. He's a bad apple. It's up to you to supervise your brokers, your individual brokers. That's part of the whole self-regulatory emphasis. That's the new thing these days. So what is your response to this whole idea that you should go to arbitration, Raymond James should go to arbitration because Raymond James negligently supervised Mr. Keogh? I think, as Judge Keenan suggested, you're putting the cart before the horse. You have to be a customer before you're entitled to the unilateral offer by a securities company to arbitrate. If you're not a customer, you don't get to arbitration. Oddly enough, I think, in arbitration— Do you need to open an account to be a customer? You don't have to open an account, Judge, although under the new FINRA regulation, there has to be investment or brokerage advice given and compensation paid. You don't have to have an account. There were a number of these claimants. But that's one of the factors, certainly. It certainly is. If you got an account—and to give you a very good example, there were a couple of other claimants that Mr. Chapman represented. They had Raymond James brokerage accounts. Raymond James had nothing to do with Innofin, but these people just by coincidence had Raymond James brokerage accounts. That alone required Raymond James to submit the Innofin claims— If you have an account, that automatically would make you a customer, it would seem. That's correct. But if you don't have an account, that doesn't automatically make you not a customer. It does not. The court's reasoning in Washington Square, I think, is apropos. It says, Nothing in the language of the Code excludes from the class of customer who believed they were dealing with a member or an associated person. If these claimants in this case believed that they were dealing with Raymond James, perhaps, but for the recent UBS case, they would be customers. There's some expectation there— But knowledge wasn't a part of the Washington Square case. Those folks did not know. Well, I think, and I've read the case so many times, my brain is dizzy, but I think that there is something there because the court in its concluding comments— If you're looking for something, what we have here is we have a non-broker, a tax lawyer, I guess. The judge sort of popped on that fact. I guess he was trying to go with the lawyer fees as opposed to the commission fees. I don't know where that goes. But you've got someone here who is not a broker, who has clients from estates. He's a tax-type guy. He has big-money-type clients who need to invest some money. And here you have this HEO guy who's with Raymond James, and he associates with this Innofin. And the question becomes is, how much can you connect those dots without it being— Maybe in the UBS case now, you actually have to purchase to be a customer. But the question is, does the relationship lend itself to one who, in fact, is doing that? That even though it's not a direct purchase, the fact that he receives commissions— I don't know how— And you say his wife did it, but I'll assume husband and wives typically, they've got to kind of share those things. But let's assume that fact that he's getting commissions, the $1 million a year. I mean, what does that mean? I mean, I don't understand. If he is actually receiving commissions from these sales, and he is working with Raymond James, Raymond James doesn't know about it, as the trial judge went through great lengths to say, doesn't know anything about it, as you say, then what's the problem with trying this case on just the issue of negligent supervision in an arbitration form, which for the most part, you guys kind of like that. You really push for an arbitration form, but in this instance, you gave some reasons below as to why you didn't think that was such a good idea, but I'll accept that. But why is that not getting into the realm of at least a determination that there is something here, as you use the word? To reiterate my phrase, you're putting the cart before the horse. If these claimants are not customers, then they can't go that route. I want to make sure this cart is not too much before the horse, because how are you going to determine they are customers if you don't look at the relationship? And the relationship is determined, well, yes, in other words, if you just start out, they're not customers because they don't know anybody else. That's the end of the inquiry. Or do you say, let's look at what's going on here, and in fact, they may not be what we call someone who goes down to a local retailer that's a customer directly there, but in this world, with the cases like Washington Square and others that are out there, you don't have to have that kind of, you don't have to actually go in and buy from this store, except under this case that came out, as some indication, in order to be a customer. But let me identify another area of concern. The cases frequently talk about the reasonable expectations of the broker, the members, and whether or not forcing arbitration would be contrary to those reasonable expectations, frustrate those. I look at it from two sides. If you're my customer, I have to arbitrate. If the customer is over here and doesn't have some reasonable expectation that they're dealing with my client, the member, then it certainly is both frustrating the expectations of FINRA members that they are making some commitment to arbitrate those things that they don't have to arbitrate, and there's no reliance here. Well, that's the interesting point, is if you're in a situation where the brokerage house is obligated to arbitrate with people that the brokerage house really doesn't even know exist, and that you have to go through a number of links, from Enfelt to Keogh to Affelt to whatever, then there's a whole realm of unknowns with whom a brokerage house can be forced into arbitration. And I suppose if we define the duty to arbitrate that broadly, that you're going to get brokerage houses that are really reluctant to sign on to arbitration agreements because they don't know what kind of exposure that's going to mean to unknown persons out there. So the system depends upon two things. Number one, protection of investors, and that's critical. But it also, for the system to work, you've got to get brokerage houses to buy into the system. You know, every business, whether it's a every business, when it signs a contract, wants to have some foreseeable limit to its exposure and liability. And otherwise, we're not going to get brokerage houses to participate. Is that a danger? It is a danger, Your Honor. And again, arbitration is a unique animal. The fact that you can't arbitrate doesn't say you can't file suit in a court of law. But his problem here is that he's predicating his action on a concept of negligence, negligent supervision. And negligent supervision, as all torts, require the existence of a duty. And I haven't heard anything yet that suggests to me what Raymond James' duty under negligent supervision theory is to these investors. And isn't that part of the problem? How can you create a basis for arbitration on a negligence theory when you can't establish a duty? Now tell me maybe that's not part of... I didn't see that in your argument. Do you see a problem with that? That's part of the argument, Your Honor. And I think listening to the Morgan-Keegan case, I think perhaps you raised or Judge Niemeyer raised the issue of privity. Morgan-Keegan's not out yet. That's next week. But listening to the argument, there's got to be I call it connection, some nexus that creates that duty or creates that relationship. Judge Keenan's point is crucial, isn't it, because there's such a tendency to make tort law out of every contract, to make breaches of contracts into torts and to make all sorts of contractual relationships to pull them in in one way or another into the realm of tort. And that step can be very destructive of any kind of planning process within a business because contract has a certain framework and the parties get to negotiate limits on liability and anything else they want to negotiate with. Tort law is wide open. You don't know what's going to hit you. And you start transferring tort concepts or you start importing tort concepts into this whole business and you lose the structure of it, don't you? Well, you lose the structure, you do a disservice to the reasonable expectations of the businesses. I mean, the birth official case out of the 8th Circuit was interesting because you had a managing broker there who was sued, not by a client, but by somebody. But aren't you, to use your words, putting the cart before the horse again? Isn't that issue if we were to decide this case that it goes to arbitration, that would be decided at arbitration or it would be decided if we decide against you in a court of law. The question of duty and all of that of negligent supervision comes then. The question here is, is this a matter that must go to arbitration? And this nexus business has to do with determining the definition of customer. If there is a customer, it doesn't matter what they sued for, you have to arbitrate it. Is that correct? That's correct. So the whole business of what the cause of action, whether it's negligent supervision or whatever, is really irrelevant because the only question here is from your perspective is was this a customer? And I do have a question on that. The AFLIC person here received a commission of some amount of 29%. Was that from Keogh? He received that directly from Innofen. So Innofen paid a commission two commissions, one to AFLIC and then one to Keogh? From what we see and I think it's at page 420 of the appendix, we have an affidavit from a trustee in bankruptcy that provided a chart that showed that here are commissions, Mr. or Mrs. Keogh received this, Mr. AFLIC received this on this. But Mr. AFLIC was not in a position to receive a commission. He's a lawyer. He's not a broker. He's not permitted to do that. We won't get into that legality here, but if the evidence showed that this commission was actually given to Keogh and he in fact gave 29% to AFLIC, would that establish some type of agency relationship? No, Your Honor, it would not and you're getting into the kind of agency again that I was getting into in Berthel Fisher. There's no real connection to Raymond James. There is certainly connection. I understand that. I'm trying to connect to see if there's some connection with Keogh because there's clearly connection with Keogh to Raymond James. The question is, is there a connection in my mind with Keogh and AFLIC and was AFLIC receiving commissions from Keogh? As I understand it, the one exhibit simply showed a chart of the commissions that were paid and allocated X% to Mr. Affeld, X% to either Mr. or Mrs. Keogh. As I understand it, it came directly from Innofen whether Mr. Affeld should have received anything as a lawyer in this case. There's no indication. I think the trial judge made it quite clear he was not a broker. He's a lawyer. He made that clear because he was thinking maybe these are lawyer fees. This is no lawyer fees. This is commissions. But what is clear from the stipulations and clear from the affidavits is that each one of these investors relied upon Mr. Affeld and Affeld is not an associate. He's not a broker. It's not Raymond James. So they relied upon that. They could have hired Mr. Keogh. They were introduced to him. Two of them met face-to-face with him. They didn't hire him. Had they hired him, even though this was unbeknownst to Raymond James would be on the hook for arbitration. But, Your Honor, I suggest there's not that reasonable nexus between what Mr. Affeld did and what Mr. Keogh did and supervision by Raymond James. So if a company or firm such as Raymond James is prudent in this matter if this goes in the way you want to go, they would know absolutely nothing about what their agents are doing. They would make it their business. They'd say, don't you tell me any of that stuff. Because otherwise it would be a possible negligent supervision claim and then you would create these customers and we'll have to go to arbitration. So the best way to do it is to not supervise them. In other words, you don't want to know. Well, you do want to know, Your Honor, because you're going to have rogue situations like this are the exception and not the rule. Brokers make all kinds of reports to Raymond James and other broker dealers. And Raymond James has a duty to look at that carefully as the court did in the Walnut Securities case even though I think it came up with the wrong result. The Walnut case is an interesting case. It seems to cut the other way somewhat. But I mean it seems to indicate in that case the court says you ought to look at the tax return. So you should have done something to see what was going on here. But here what it seems to be indicating what we seem to be indicating from your perspective is you don't look at the tax return. You don't go and say to that agent, have you been doing some outside business here that you shouldn't be doing. You don't say those things because if you don't know then it will fit within this realm that  that he has this maybe tenuous relationship with. I disagree with the premise but it's not a premise. It's actually a conclusion that I think is going to arise from the outcome of this case unless you tell me how it doesn't. Well I think the FINRA regulations require a certain amount of restrictive review and scrutiny by the broker-dealer. So I don't think that makes any difference. What you might say in response to my fine colleague's question is that whether or not you go into arbitration a rogue broker who engages in this kind of activity is going to bring upon the brokerage house a house of troubles. All kinds of regulatory violations, all kinds of difficulty, all kinds of bad publicity and everything so the incentives to keep track of the and what the broker is doing remain high from any kind of irrespective of arbitration they're just a whole lot of other sanctions and a whole lot of other untoward publicity that lies out there with this kind of thing. There certainly are. I want to make sure I follow up on that because I think I'm totally in agreement with that. Totally in agreement with your perspective that they have this duty to supervise this agent and you were about to go, seems like to me you were about to say man there's a pretty high need to do that. So if they have that duty then we've got these customers what we really ought to be looking at is are these customers connected with Keogh because there's no question there's this very strong relationship in which Raymond James has to supervise his minions so to speak. In this instance Keogh as you indicated and Judge Wilkerson has alluded to this high degree of need to control or to know what he's doing. If he is doing something then the connection in terms of customer needs to see what is he doing with them. Is that not our analysis as opposed to looking trying to connect the customers directly with Raymond James. Well you have to connect. He's an associate you know he's not the member so you've got to connect the dots between Keogh and the customers here. Yes. But again the stipulations in the affidavits indicate that that connection was broken. They chose not to hire him. They based their decision on Mr. Addell's recommendation. And that's all I want to go with. I want to focus on it seems to me that our analysis in this instance then focuses on the connection between Keogh. If he does not have, they are not customers through him they are not customers. But if our analysis moves from forget Keogh they just didn't have any connection with Raymond James who is on the other side. That's a different question because there is a direct line with Keogh and Raymond James through as you said and Judge Wilkinson alluded to this great duty or whatever obligation to oversee him. Correct? I agree in part your honor and I thank you for the additional time you've given me but I still think under UBS you don't even have to get quite to that analysis but I think if you get to that analysis the evidence is uncontradicted that there wasn't that connection between Mr. Keogh and the claimants. Thank you very much your honor. Did you have any more questions? Mr. Chatelain we'd be happy to hear from you in rebuttal sir. Thank you your honor. The appellants need to be in FINRA arbitration to enforce a remedy under the FINRA code. The remedy is failure to supervise. The evidence is that a Raymond James representative sold millions of dollars worth of illicit securities some directly but also through an agent. The agent was somebody in an influence. Could you tell us, I don't mean to interrupt Mr. Chatelain but what's the supervision duty you're talking about? Were they required to put a security guard on him to make sure that he didn't engage in outside business? What was the duty that they had? The duty to supervise arises under the FINRA code. What was the duty? What did they have to do here in this case? Well in this case they should have tracked his email, his correspondence incoming and outgoing correspondence which would have revealed what he was doing. Do you think that an employer is required to censor each one of its agents emails to see whether they're engaging in any transaction that might not be part of the FINRA members ordinary business activities? Yes, absolutely. In fact it's written into the Raymond James code of regulations and handbook. That they have to look at every email? They're supposed to find out whether or not their associated persons are engaging in securities law violations. So they have to hire oversight people to investigate hundreds of people's daily email to question the content of that email? There's a branch manager with that function. There's an office of supervisory jurisdiction with that function and there's a compliance office. What if this person uses another email account that's not a Raymond James account? What if they work out of their home for this? What's the duty there? Again, all of those issues are addressed by the branch manager system. They have to monitor any personal accounts they have as well? It seems to me you're imposing an impossible situation on the employer. With respect, Your Honor, I'm simply telling you what the Raymond James handbook and what SEC regulations have required. How do you determine if the employee has any accounts at home? How do you determine if they have a comcast.net? Or gmail.com? I don't understand that question. If the registered rep is making business use out of a personal email, the SEC requires that the personal email system be tracked using the firm's email tracking system. That's the regulation. We don't even get to this question of duty unless we go your way on arbitrability. That's absolutely right. We're coming back once again. I mean, there are a lot of issues that hang around the periphery of the case, but the whole question is whether there's a customer relationship. To be honest, this seems very, very attenuated. I suppose Keogh received the commissions from the sale of security but am I correct? I want to make sure I understand the point that the commissions were paid by the issuer of the security, Innofin? Not by Raymond James? He received the commissions from Innofin? Some commissions were paid by the issuer, Innofin, and also Keogh remitted commissions an additional amount to AFLT as additional compensation. Did Raymond James pay the commission? Raymond James did not. Raymond James was not in the loop. I mean, to me, there's got to be some kind of nexus between the investor and that's what customer implies, is that there's some kind of relationship between the brokerage house and the investor. Some kind of relationship. And as I read these facts, I can't see that they had much of a relationship at all. And if we try to construct a relationship from this sort of attenuated basis, we're just engaging in a really coercive act, which says, we don't care how your contract reads, we're going to force you to do this. And when you start taking leave of contracts and statutes and everything, then what authority do we have? Because we've left our grounding in law. Our rulings have to be grounded in law. And that means contract and statute and those sorts of things. And the word in this contract, customer, presupposes a relationship that under the facts of this case either is nonexistent, not there, or existent in some highly remote and attenuated form. Judge Wilkinson, Keogh received a commission of $21,250 when Robert Barkin purchased Innofin. Right, but you're ignoring our definition of customer in UBS, which says that it has to be in the course of the member's business activities of investment banking and securities. And this wasn't in the course of Raymond James' business activities of investment banking and securities. You just haven't said how you fit that in there. Let me round about first to an earlier comment you made about the arduous nature of the supervision requirement. Well, that's not the question on the floor. Just simply to say, though, that when you balance the harm... I want you to conclude very quickly. Okay? You can make one last statement but just make it concise. Okay? Appellants respectfully request that the trial court be reversed and the injunction lifted. Thank you very much.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, James A. Wynn, Jr.